## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

PATRICK KLANCAR,                          Case No. 1:20-cv-730
      Plaintiff,                          McFarland, J.
                                          Litkovitz, M.J.

      vs.

THE HARTFORD LIFE AND                     **ORDER AND REPORT AND**
ACCIDENT INSURANCE COMPANY                **RECOMMENDATION**
      Defendant.

Plaintiff Patrick Klancar brings this action to recover long-term disability benefits under 29 U.S.C. § 1132(a)(1)(B) of the Employee Retirement Income and Security Act (ERISA), 29 U.S.C. § 1001 *et seq.*, against defendant The Hartford Life and Accident Insurance Company (Hartford). This matter is before the Court on the parties' cross motions for judgment on the administrative record (Docs. 32-1, 36) and responses thereto (Docs. 41, 42). Plaintiff has also filed a motion to strike defendant's statement of proposed undisputed facts (Doc. 32-2), to which a response and reply were filed. (Docs. 38-40).

### I.    Motion to strike

Plaintiff argues that Hartford's statement of proposed undisputed facts (Doc. 32-2) should be stricken as exceeding Judge McFarland's standing order regarding page limits and inconsistent with the proper method of adjudicating the claim at bar. Hartford responds that the filing is consistent with Judge McFarland's standing order regarding motions for summary judgment and that, at most, the remedy should be an opportunity for plaintiff to file a responsive document. Plaintiff argues in reply that such filings are superfluous to the administrative record, which the Court is required to review *de novo*, and to require a responsive briefing would impose a significant expense.

The Sixth Circuit has held "that summary judgment generally is an inappropriate mechanism for adjudicating ERISA claims for benefits." *Univ. Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 845 n.2 (6th Cir. 2000) (citing *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 617-619 (6th Cir. 1998)).  This is the case because, "[g]enerally, a court reviewing a party's ERISA claim cannot consider evidence outside the Administrative Record." *Likas v. Life Ins. Co. of N. Am.*, 222 F. App'x 481, 485 (6th Cir. 2007) (citing *Wilkins*, 150 F.3d at 619). In *McKenna v. Aetna Life Ins.* Co., No. 13-cv-12687, 2014 WL 5420217, at *7 (E.D. Mich. Oct. 23, 2014), *rev'd on other grounds*, 620 F. App'x 445 (6th Cir. 2015), the court considered whether an ERISA plaintiff's proposed exhibit reflecting a "timeline of relevant events" was a relevant aid to the court or an impermissible expansion of the record.  The court concluded that the exhibit was unnecessary, construed it as argument beyond local page limit rules, and therefore struck it. *Id.* at *7-8.  The Court finds the reasoning in *McKenna* persuasive and adopts it in this case.[1]  Hartford's proposed statement of undisputed facts (Doc. 32-2) will be stricken.

## II.  Cross Motions for Judgment on the Administrative Record

### A.  The ERISA plan

Plaintiff was employed by Robert Bosch Steering LLC as a Financial Analyst II (Doc. 17 at PAGEID 308, Doc. 20 at PAGEID 1429).  After receiving short-term disability benefits (*see* Doc. 16 at PAGEID 113), plaintiff applied for long-term disability benefits under Robert Bosch's benefit plan (Plan), for which Hartford is the claims fiduciary (Doc. 22 at PAGEID 1982).

---

[1] The Court located one decision in this district in which the Court considered a proposed statement of undisputed facts on a motion for judgment on the administrative record. *See A.G. by & through N.G. v. Cmty. Ins. Co.*, No. 1:18-cv-300, 2020 WL 7028458, at *1 n.4 (S.D. Ohio Nov. 30, 2020).  The court acknowledged that motions for judgment on the administrative record are not contemplated by Rule 56 of the Federal Rules of Civil Procedure, but it nevertheless elected to consider the statement of undisputed facts because it was consistent with the administrative record. *Id.*  It also appears that the statement was not opposed. *Id.*

The Plan provides for a disability benefit if a participant "1) become[s] Disabled while insured under [the Plan]; 2) [is] Disabled throughout the Elimination Period; 3) remain[s] Disabled beyond the Elimination Period; and 4) submit[s] Proof of Loss to [Hartford]." (*Id.* at PAGEID 1959). The Plan defines "Disabled" to mean that a participant is:

> prevented from performing one or more of the Essential Duties of: 1) Your Occupation during the Elimination Period;[2] 2) Your Occupation, for the 24 months following the Elimination Period, and as a result Your Current Monthly Earnings are less than 80% of Your Indexed Pre-disability Earnings; and 3) after that, Any Occupation.

(*Id.* at PAGEID 1968). "Your Occupation" is defined as "Your Occupation as it is recognized in the general workplace" and not by reference to a participant's "specific job . . . for a specific employer . . . at a specific location." (*Id.* at PAGEID 1971). "Essential Duty" is defined as "a duty that: 1) is substantial, not incidental; 2) is fundamental or inherent to the occupation; and 3) cannot be reasonably omitted or changed[,]" which includes the ability to work the hours of a regularly scheduled workweek. (*Id.* at PAGEID 1969). Plaintiff's job description with Robert Bosch listed essential duties and responsibilities including preparing financial position and business activity reports; preparing budgets, budget reports, and supporting documentation; preparing company financial status and progress reports; overseeing investments; analyzing balance sheets and providing advice thereon; providing audit support; preparing regulatory reports; performing internal control functions; and providing financial guidance. (Doc. 19 at PAGEID 1123). Plaintiff described his job functions as "finance, overseeing financial functions, computers, typing, reporting, planning, reviewing capital assets, desk work, some walking standing, no lifting[.]" (Doc. 16 at PAGEID 108).

---

[2] The Elimination Period was 180 days from the date of plaintiff's alleged disability. (Doc. 32-1 at PAGEID 2526; Doc. 36 at PAGEID 2634).

The Plan also provides that Hartford "may request Proof of Loss throughout Your Disability, as reasonably required" and that Hartford "must receive proof within 30 day(s) of the request." (Doc. 22 at PAGEID 1965). All such proof must be satisfactory to Hartford. (*Id.*). "Proof of Loss" is defined in a non-exhaustive list, including "any and all medical information. . . ." (*Id.* at PAGEID 1964-65). The Plan also gives Hartford the right to require meetings between a Plan participant and a vocational, medical, or functional expert. (*Id.* at PAGEID 1965). Benefit payments may be terminated under the Plan, as relevant here, on the earlier of (1) the date the Plan participant is no longer disabled under the Plan or (2) the date the Plan participant fails to furnish proof of loss under the Plan. (*Id.* at PAGEID 1960).

Plaintiff stopped working as of October 11, 2016. (Doc. 17 at PAGEID 475). Hartford approved plaintiff's short-term disability claim on September 25, 2017 and paid it through April 10, 2017. (Doc. 16 at PAGEID 62, 113).

On November 29, 2017, plaintiff's then primary care physician Dr. Heidi Krebs completed an Attending Physician's Statement (APS). (Doc. 19 at PAGEID 1002-03). Dr. Krebs identified diabetes type II as plaintiff's primary condition, with stroke history, hypertension, and hyperlipidemia as secondary conditions. (*Id.*). Under the section for objective physical findings, Dr. Krebs noted poorly controlled labile diabetes, swallowing difficulty, residual right sided neuropathy from stroke, neurological deficit, right side sensory deficit, and foot drop. (*Id.* at PAGEID 1002). The "Restrictions/Limitations" component of the form is crossed out with the notation "VOID patient declined testing unable to test." (*Id.* at PAGEID 1003).

Six months later, on May 31, 2018, plaintiff's new primary care physician Dr. Jay Rissover completed an APS. (Doc. 19 at PAGEID 1036-37). Dr. Rissover identified "diabetes

4

with neuropathy" as plaintiff's primary condition, with fatigue as a secondary condition.  (*Id.* at

PAGEID 1036).  Under the section for objective physical findings, he noted "labs confirm

uncontrolled diabetes[.]"  (*Id.*).  Unlike Dr. Krebs, Dr. Rissover completed the functional portion

of the APS and opined that plaintiff was able to sit continuously for one hour at a time, for a total

of six hours in an eight-hour workday; stand continuously for one hour at a time, for a total of

five hours in an eight-hour workday; and walk continuously for one hour at a time, for a total of

five hours in an eight-hour workday.  (*Id.* at PAGEID 1037).  He opined that plaintiff could

never kneel/crouch, climb, or balance, but he could bend at the waist, drive, finely manipulate

(fingering, keyboard), grossly manipulate (grip/grasp, handle), and reach (above and below

shoulder) up to two and a half hours per day.  (*Id.*).  Dr. Rissover did not list any psychiatric or

cognitive impairment.  (*Id.*)

In a letter dated August 6, 2018, Hartford initially approved long-term disability benefits

effective April 11, 2017 (following the Elimination Period).  (Doc. 17 at PAGEID 570).

Hartford found that plaintiff was unable to perform the duties of "Your Occupation" due to his

"symptoms and impairment resulting from type II diabetes mellitus with diabetic neuropathy."

(Doc. 17 at PAGEID 559).  In a July 2018 internal Hartford note, Nurse Shaver noted that

plaintiff "would not be able to perform repetitive fingering on a consistent basis" or "sit for long

periods of time" due to neuropathy of his hands and lower extremity.  (*Id.* at PAGEID 433).

Nurse Shaver also noted that plaintiff's functional ability information was subjective and

recommended a medical update in six months.  (*Id.*).

In a letter dated October 24, 2018, Hartford requested several pieces of documentation in

connection with whether plaintiff would continue to be disabled under the Plan when its

definition of disability changed on April 11, 2019.[3]  (Doc. 17 at PAGEID 566-69).  At that point, plaintiff was required to demonstrate that he was "prevented from performing one or more of the Essential Duties of . . . Any Occupation[,]" which is defined as: "any occupation for which [plaintiff was] qualified by education, training or experience, and that has an earnings potential greater than the lesser of: 1) the product of [plaintiff's] Indexed Pre-disability Earnings and the Benefit Percentage; or 2) the Maximum Monthly Benefit."  (Doc. 22 at PAGEID 1968). Hartford requested a Claimant Questionnaire, Social Security Payment Options Form, Work & Education History Form, and an APS.  (Doc. 17 at PAGEID 567).

Dr. Rissover completed another APS on November 14, 2018, in which he further limited plaintiff to intermittently sitting, standing, and walking only one hour each for a total of three hours each in an eight-hour workday.  (Doc. 20 at PAGEID 1431-32).  He opined that plaintiff could never bend at the waist, kneel/crouch, climb, or reach (below shoulder) and could balance, drive, finely manipulate (fingering, keyboard), grossly manipulate (grip/grasp, handle), and reach (above shoulder) only up to two and a half hours.  (*Id.* at PAGEID 1432).  Dr. Rissover added anxiety as a psychiatric impairment.  (*Id.*).

In a letter dated December 27, 2018, Hartford informed plaintiff that it would no longer pay long-term benefits after December 28, 2018, because plaintiff had failed to provide proof of his ongoing disability as requested in October 2018 and in several follow-up inquiries.  (Doc. 17 at PAGEID 556-61).

Plaintiff attempted to reopen his claim unsuccessfully.  (*See* Doc. 17 at PAGEID 542, 550, 552, 554).  In conjunction with this, Dr. Rissover completed another APS on February 26, 2019, which was virtually identical to his November 14, 2018 APS.  (Doc. 21 at PAGEID 1447-

_____

[3] The definition of disability under the Plan changed twenty-four months after the expiration of the 180-day Elimination Period, which was calculated from October 11, 2016.  (*See* Doc. 22 at PAGEID 1968).

48). Less than two months later, on April 8, 2019, Dr. Rissover completed another APS. (Doc.

25 at PAGEID 2428-29). This time, he recommended significantly more severe restrictions. Dr.

Rissover restricted plaintiff from all activities except driving, which he was permitted to do for

up to two and a half hours. (*Id.* at PAGEID 2429). He further reduced plaintiff's ability to sit,

stand, or walk intermittently to up to only one hour per day for a total of one hour each in an

eight-hour workday. (*Id.*). For the first time, Dr. Rissover's APS noted diagnoses and symptoms

(joint pain, neuropathy, and stroke) that supported his restrictions. (*Id.*). Dr. Rissover added

"short term memory loss" as a cognitive impairment. (*Id.*).

Hartford eventually reopened the claim. (*See* Doc. 17 at PAGEID 401). In August 2019,

Dr. Chalonda Hill, certified in occupational medicine, conducted a peer review of plaintiff's

medical records. (Doc. 22 at PAGEID 2029-2039).[4] While Dr. Hill agreed that the record

supported plaintiff's diagnoses of essential hypertension, type II diabetes mellitus, coronary

artery disease involving native coronary artery of heart without angina pectoris, diabetic

polyneuropathy, mixed hyperlipidemia, nonalcoholic steatohepatitis (NASH), hypothyroidism,

and obstructive sleep apnea, she found "a lack of clinical evidence to support functional

impairment or the need for medically necessary restrictions" such as "abnormal clinical exam

findings, abnormal imaging studies, or abnormal diagnostic studies." (*Id.* at 2037). Hartford

issued another denial letter on September 19, 2019. (Doc. 17 at PAGEID 503-09). It stated, in

pertinent part:

> When we investigated whether your client could perform the duties of Your
> Occupation and Any Occupation, we considered your client's prior education,
> training and experience. The information your client provided to us shows that
> you have Bachelors degree in Accounting and Finance. Your client has worked
> as a Financial Analyst II for 10 months, as a Controller Electric Steering for 1

---

[4] Dr. David Yuppa, a psychiatrist, also conducted a peer review of the file. (*Id.* at PAGEID 2040-43). Because
plaintiff does not allege disability related to psychiatric conditions, the Court does not discuss his review.

> year, as a Consultant for 1 year and as an International Controller for 12 years. Your client has also told us that your client is skilled in Word, Excel, PowerPoint, Access, E-mail and Internet.
>
> We also reviewed all of the medical information in your client's file to decide if your client continues to meet the definition of Disability.  We have medical information from each of the doctors listed in this letter.
>
> The medical information submitted by board certified occupational medicine specialist, Dr. Chalonda Hill shows that your client is capable of working full time 8 hour work days for 40 hours weekly without restrictions and/or limitations since 10/11/2016.
> . . . .
>
> We compared this information to the Essential Duties of Your Occupation as a Financial Analyst II.  Based on this information, we have concluded that your client is able to perform these duties as of 12/28/2018.
>
> We have concluded from the combination of all the medical information in your file that your client is able to work in an office environment, which could include sitting or standing for the majority of the day[, a]long with lift, carry, push and pull material on an infrequent basis.

(*Id.* at PAGEID 506-07).  Following this decision, on January 3, 2020, the Social

Security Administration denied plaintiff's disability insurance benefits claim.  (Doc. 23 at

PAGEID 2103).

Plaintiff appealed Hartford's decision.  (Doc. 23 at PAGEID 2049-322; Doc. 24 at

PAGEID 2324-59).  In April 2020, Dr. Arousiak Varpetian Maraian, a neurologist, conducted a

peer review of plaintiff's medical records.  (Doc. 25 at PAGEID 2438-48).  Dr. Maraian found

that the record did not support a finding that plaintiff suffered from diabetic polyneuropathy,

because plaintiff "did not complain of any neuropathic pain and was not prescribed medication

for [such] pain."  (Doc. 25 at PAGEID 2447).  Dr. Maraian also noted that examinations by Drs.

Rissover and Cohen in June 2019 and May 2018, respectively, showed normal diabetic foot

examinations.  (*Id.*).  As to plaintiff's history of stroke with residual right sided neurological

issues, Dr. Maraian noted that plaintiff had not consistently noted associated symptoms after

December 29, 2018.  (*Id.*).  As to plaintiff's fatigue, Dr. Maraian found that no medical or

neurological etiology was found to support this complaint and cited the consistent advice by

plaintiff's treating physician of increased activity and exercise.  (*Id.*).  As related to plaintiff's

purported confusion and inability to concentrate, Dr. Maraian noted that plaintiff's cognitive

screens were consistently normal and that plaintiff's neuropsychological testing was inconclusive

due to the test administrator's conclusion that plaintiff did not make a genuine effort during the

testing.  (*Id.*).  In conclusion, Dr. Maraian found that the severe functional limitations

recommended by Dr. Rissover were unsupported and contradicted by his own clinical

documentation.  (*Id.* at 2448).

Hartford upheld the denial of plaintiff's claim.  (Doc. 17 at PAGEID 488-93).  It stated,

in pertinent part:

> [Y]ou provided restrictions and limitations for your client but these must be
> supported by the medical records on file; you advise that your client is unable to
> engage in any occupation or his own, the adverse claim decision made by the
> claim office was specifically a determination of your client not meeting the Policy
> definition of Disability from his own occupation only; you advise that the
> conclusions from the prior peer reviewer are unsupported so we have obtained an
> Independent Medical Review to provide a full and fair review.  You also noted
> that the prior peer reviewer did not contact Dr. Rissover, please be advised that
> this is not a requirement.
>
> Disability is based on medical evidence and the existence of a diagnosis alone
> does not indicate a disability.  While your client's self-reported symptoms have
> been considered your client's symptoms must also be supported by the level of
> treatment, symptoms, level of activity and exam results in the clinical record.  It is
> not sufficient for an attending physician to issue restrictions without corroborating
> medical evidence.  The medical information provided does not demonstrate
> clinical findings to support the severity of Dr. Rissover's restrictions and
> limitations.  While your client's physician may have recommended being off
> work, this recommendation alone does not indicate a disability[.]  Disability is
> established when there is medical evidence of restrictions and limitations such
> that it would prevent your client from performing "Your Occupation".  Reported
> symptoms, a diagnosis, the need for treatment or a doctor's out of work note alone
> is not sufficient to determine a disability.  We are not disputing your client's
> medical condition and acknowledge and respect your client's medical provider's

opinions and understand that your client has ongoing symptoms that you believe precludes him from working. However, the medical information received does not provide medical evidence to support a functional impairment that would preclude him from performing his own occupation as of 12/29/2018.

Our appeal review has concluded based on the medical evidence in your client's file along with the Independent Medical Review dated 4/13/2020, we find that your client does not meet the Policy definition of Disability from Your Occupation. As such, the termination of your client's claim for benefits was appropriate and the claim remains closed.

(*Id.* at PAGEID 492).

### B. Medical history

#### 1. Onset of plaintiff's alleged disability

Plaintiff suffered a stroke in November 2015. (Doc. 18 at PAGEID 682). On June 29, 2016, plaintiff established a primary care relationship with Dr. Joseph Vonderbrink. (*Id.*). Plaintiff complained of fatigue, headache, and abdominal pain. (*Id.*). That same day, Dr. Vonderbrink sent plaintiff to the hospital for his severe symptoms of pancreatitis. (Doc. 19 at PAGEID 938). Discharge records reflect diagnoses of diabetic ketoacidosis as well as acute pancreatitis, which was likely secondary to hypertriglyceridemia and hypertension. (*Id.* at 932). At an August 4, 2016 diabetes check-up, Dr. David Littrell noted diagnoses of type II diabetes mellitus with hyperlipidemia, hypertriglyceridemia, essential hypertension, and metabolic pancreatitis. (Doc. 18 at PAGEID 714-15). On September 26, 2016, following another hospitalization (this one related to chest pain) (*see id.* at PAGEID 750), plaintiff presented to Dr. Vonderbrink reporting fatigue but no vision issues, chest pain, palpitations, abdominal pain, back pain, neck pain, myalgias, dizziness, tingling, sensory change, speech change, weakness, or memory loss. (*Id.* at PAGEID 754). Plaintiff's physical examination showed no abnormalities. (*Id.* at 754-55). Dr. Vonderbrink noted plaintiff's diagnoses of uncontrolled type II diabetes

mellitus with diabetic nephropathy, with long-term current use of insulin, mixed dyslipidemia, and hypertension but also noted that these conditions were stable and improving.  (*Id.* at 757).

## 2.  Endocrinology: Drs. Wael Eid and Robert Cohen

Plaintiff treated with Dr. Eid on August 30, 2016, reporting fatigue, visual disturbance, heart palpitations, abdominal pain, arthralgias, back pain, myalgias, neck stiffness, dizziness, weakness, and numbness.  (Doc. 18 at PAGEID 736).  Plaintiff's physical examination, however, was normal, including no abnormal neck or musculoskeletal range of motion or tenderness, no abdominal or chest tenderness, and no neurological abnormalities (normal reflexes, muscle tone, and coordination).  (*Id.* at PAGEID 737).  (*See also id.* at PAGEID 787) (diabetic eye examination conducted October 17, 2016 demonstrated that plaintiff's diabetes was "without ophthalmic manifestations").  While Dr. Eid recorded similar reported symptoms a month later, (*id.* at PAGEID 760, 764), plaintiff's physical examination was again normal (*id.* at 764-65).  During 2017, plaintiff continued to report similar symptoms to Dr. Eid (*id.* at PAGEID 803, 811) without abnormalities on physical examination (*id.* at PAGEID 803-04; 811-12).

In January 2018, Dr. Eid referred plaintiff to Dr. Cohen due to a case of "difficult[] to control diabetes[.]"  (Doc. 20 at PAGEID 1328).  Plaintiff reported being chronically weak and fatigued with problems on his right side (burning sensation, numbness, tingling) and that his condition had started deteriorating in May 2016.  (*Id.*).  Dr. Cohen's physical examination reflected no related abnormalities.  (*Id.* at PAGEID 1330) (no abdominal, chest, or musculoskeletal tightness; normal neck and musculoskeletal range of motion; no neurological abnormalities).  Dr. Cohen concluded that plaintiff's diabetes was mostly controlled with drugs and diet, that plaintiff "really only needs modest adjustments to get him to good glycemic control[,]" and that "nonspecific symptoms [were] likely to resolve when [plaintiff] has a better

11

handle on this." (*Id.* at PAGEID 1331).  At a follow-up in May 2018, both plaintiff's overall physical examination as well as his diabetic foot examination were normal.  (*Id.* at PAGEID 1363).

### 3.   Neurology: Dr. Stephanie Dalton and Daniel Gripshover, Ph.D.

On October 12, 2016, plaintiff saw neurologist Dr. Dalton and reported "cognitive issues . . . word finding difficulties, short term memory loss, fatigue, [and] trouble with basic calculations. . . ."  (Doc. 18 at PAGEID 776).  Plaintiff was also seeking disability paperwork from Dr. Dalton.  (*Id.* at PAGEID 776) ("He inquires about disability paperwork and states that his PCP and endocrinologist will not fill it out and he is here today hoping that I will complete the paperwork.").  Plaintiff's physical and neurological examinations were normal (including non-tender abdomen and no musculoskeletal edema), except for Dr. Dalton noting "hesitant and halting" speech with occasional stuttering and "[s]ubjectively decreased pin/temperature in the right arm/leg." (*Id.* at PAGEID 780).  In her assessment, Dr. Dalton did "not appreciate any discrete neurologic deficits" and suspected a "strong mood component to [plaintiff's] current symptoms[.]" (*Id.* at PAGEID 782).  (*See also id.* at PAGEID 776) (Dr. Dalton noting that plaintiff had been "extremely anxious throughout [the] entire encounter.").

Dr. Dalton referred plaintiff to Dr. Gripshover for a neuropsychological evaluation that took place on April 27 and June 5, 2017.  (Doc. 20 at PAGEID 1150).  While noting that plaintiff had "a number of known medical risk factors for his current cognitive complaints[,]" Dr. Gripshover concluded that "it was not possible to objectively corroborate" them "[b]ecause of [plaintiff's] subpar effort. . . ." (*Id.* at PAGEID 1155).  Dr. Gripshover cited "inconsistent performance effort on cognitive testing and improbable test results across cognitive domains." (*Id.*).  At the time of this evaluation, plaintiff reported that he was working in property

management, which included maintaining and repairing properties, as well as buying and selling exercise equipment and landscaping. (*Id.* at PAGEID 1151).[5]

Dr. Dalton examined plaintiff again in June 2018, at which point plaintiff complained of memory loss and numbness and weakness in his right arm. (*Id.* at PAGEID 1170-71). Dr. Dalton noted that plaintiff had declined further recommended brain testing related to his stroke, which might have confirmed a neurological diagnosis. (*Id.* at PAGEID 1171). Dr. Dalton's overall physical examination and detailed neurological examination showed no abnormalities. (*Id.* at PAGEID 1176) (plaintiff also did not report abdominal tenderness or musculoskeletal edema).[6] Dr. Dalton's notes reflect that plaintiff stated he "must have had a falling out with Dr. Gripshover's office"[7] and he "should be on disability." (*Id.* at PAGEID 1171). She reported plaintiff "did well on his memory testing." (*Id.* at PAGEID 1177). Dr. Dalton concluded, again, that plaintiff did "not have a neurologic diagnosis that render[ed] him disabled" despite acknowledging his risk factors. (*Id.* at PAGEID 1178). She suggested repeated neuropsychological testing if plaintiff felt it was warranted. (*Id.*).

### 4. Cardiology: Drs. Saeb Khoury and William Martin

Dr. Khoury first examined plaintiff in September 2016 following his hospitalization for chest pain. (Doc. 18 at PAGEID 768). Plaintiff reported fatigue, weakness, chest pains, arthralgias, myalgias, and back pain (*id.* at PAGEID 769, 772), but his physical examination was normal (*id.* at PAGEID 772) (plaintiff did not exhibit abdominal tenderness or musculoskeletal edema). In January 2017, he reported muscle pain, lightheadedness, headaches, and fatigue, but

---

[5] There are also multiple references in the record to plaintiff substitute teaching. (*See, e.g.,* Doc. 17 at PAGEID 457).

[6] The Court notes that, notwithstanding plaintiff's suggestion otherwise (*see* Doc. 36 at PAGEID 2637), a 2/4 reflex score is considered normal. *See, e.g., Glenn v. Comm'r of Soc. Sec.*, No. 1:19-cv-000965, 2020 WL 1890683, at *1 n.2 (N.D. Ohio Apr. 16, 2020) (citing https://www.ncbi.nlm.nih.gov/books/NBK396/ (last visited 4/16/2020)).

[7] Dr. Gripshover had noted in his report that "opportunities for secondary gain cannot be ruled out at this time." (Doc. 20 at PAGEID 1156).

his physical examination remained normal. (*Id.* at PAGEID 790, 795). In July 2017, plaintiff reported palpitation, fatigue, and muscle pain and weakness, and Dr. Khoury noted a diagnosis of "moderate stenosis of the left circumflex artery on a bend and diffuse moderate stenosis on the diagonal branch." (*Id.* at PAGEID 815). Dr. Khoury recorded a normal physical examination. (*Id.* at PAGEID 821-22) (including no chest pain, *see id.* at PAGEID 816). At a January 2018 follow up, plaintiff reported chronic pains, arthralgias myalgias, and dizziness (*id.* at PAGEID 826-27, 832), but Dr. Khoury's physical examination findings were normal (*id.* at 832-33).

Dr. Martin first examined plaintiff in May 2019 and noted a diagnosis of coronary artery disease. (Doc. 22 at PAGEID 2008). Plaintiff reported worsening chest discomfort (chest pains, dizziness, fatigue, and palpitations). (*Id.*). Dr. Martin's physical examination reflected no abnormalities. (*Id.* at PAGEID 2010). A stress test performed shortly thereafter resulted in "no significant findings" and demonstrated that the "pumping function of [plaintiff's] heart [wa]s normal and . . . [plaintiff was] getting good blood flow in the heart." (*Id.* at PAGEID 2016).

5. Primary care: Drs. Heidi Krebs and Jay Rissover

In May 2016, plaintiff reported right-sided neuropathy, short term memory deficits, and swallowing deficits to Dr. Krebs (Doc. 20 at PAGEID 1279). Plaintiff's physical examination reflected no abnormalities; in particular, she noted "negative" for "[b]one/joint symptoms, myalgia and numbness in extremity." (*Id.* at PAGEID 1281). In August 2017, plaintiff described his stroke symptoms as "improving[,]" though citing some numbness and leg weakness. (*Id.* at PAGEID 1284). Plaintiff reported paresthesia and numbness in back of lower legs but not his feet. (*Id.* at PAGEID 1286). Plaintiff reported worsening hypertension, but Dr. Krebs noted that he was not then experiencing chest pain and that his diabetes was "stable[.]" (*Id.* at PAGIED 1285). Plaintiff did not report back pain. (*Id.* at PAGEID 1286). Upon physical

examination, a diabetic foot screen was normal along with the rest of his bodily systems.  (*Id.* at 1287).

In October 2017, Dr. Krebs treated plaintiff for a foot wound possibly related to diabetic loss of sensation.  (*Id.* at 1289).  Plaintiff's physical examination was otherwise normal, noting that the loss of protective sensation was not accompanied by weakness, deformity, callus, pre-ulcer, or ulceration.  (*Id.* at PAGEID 1291).  Plaintiff saw Dr. Krebs later in October 2017 to complete a disability form.  (*Id.* at PAGEID 1294).  At the time, plaintiff reported fatigue and numbness in his extremities but no blurred vision, chest pain, or palpitations.  (*Id.* at PAGEID 1295-97).  Dr. Krebs noted that his diabetes "[h]as been managed with diet and insulin" (*id.* at PAGEID 1295) but also reported poor insight, "mildly impaired short term memory[,]" and "decreased position sense" in his right lower extremity (*id.* at 1297).  She also noted that plaintiff did not report blurred vision, burning of extremities, chest pain, foot ulcers, or hypoglycemic episodes.  (*Id.* at PAGEID 1295).

In November 2017, plaintiff complained only of fatigue but not weakness, dizziness, memory impairment, paresthesia, joint or muscle pain, chest pain, abdominal pain, or numbness.  (*Id.* at PAGEID 1303-04).  Dr. Krebs, however, noted "[]chronic sensory deficit right" and "mild foot drop."  (*Id.* at PAGEID 1302, 1304 ).  The history of present illness section of the notes states that plaintiff's diabetes was "getting worse[.]"  (*Id.* at 1302).  Dr. Krebs completed an APS at the time of this visit, noting plaintiff's diagnoses of type II diabetes, history of stroke, hypertension, and hyperlipidemia.  (Doc. 19 at PAGEID 1002).  The statement also includes Dr. Krebs's record of "Objective Physical Findings" that included "labile Diabetes poorly controlled . . . residual right sided neuropathy from stroke, neurologic deficit, right side sensory deficit foot

drop." (*Id.*).  As noted above, however, Dr. Krebs was unwilling to fill out the functional portion of the APS without plaintiff's agreement to associated testing.  (*Id.* at 1003).

Plaintiff established care with Dr. Rissover in February 2018.  (Doc. 23 at PAGEID 2170).  Dr. Rissover reviewed plaintiff's medical history (including cerebral infarction due to basilar artery occlusion, chronic fatigue syndrome, coronary artery disease, diabetic polyneuropathy associated with type II diabetes mellitus, essential hypertension, history of pancreatitis, hypothyroidism, migraine, mixed hyperlipidemia, and NASH).  (*Id.* at 2170-71).  Plaintiff did not complain about fatigue, but he complained about trouble swallowing, chest pain, myalgias, dizziness, weakness, and right-sided numbness.  (*Id.*at PAGEID 2172).  His physical examination was normal.  (*Id.* at PAGIED 2173).  On diabetic monofilament examination, his right foot was "abnormal."  (*Id.*).  However, the remainder of the foot examination was normal. (*Id.*).

In April 2018, plaintiff was seen by Dr. Rissover for his annual physical.  (*Id.* at PAGEID 2180).  Plaintiff added fatigue, abdominal pain, back and neck pain, and confusion to his list of complaints.  (*Id.* at PAGEID 2182-83).  Plaintiff's physical examination was normal and revealed normal range of motion of the neck and back, no edema or tenderness, and no cervical adenopathy.  (*Id.*at PAGEID 2183-84).  Dr. Rissover found that plaintiff "[wa]s doing well with current medications and does not have barriers to adherence."  (*Id.* at PAGEID 2185).

A few months after he began seeing plaintiff, on May 31, 2018, Dr. Rissover completed his first APS.  (Doc. 19 at PAGEID 1036-37).  He opined that plaintiff was able to sit continuously for one hour at a time, for a total of six hours in an eight-hour workday; stand continuously for one hour at a time, for a total of five hours in an eight-hour workday; and walk continuously for one hour at a time, for a total of five hours in an eight-hour workday.  He

opined that plaintiff could never kneel/crouch, climb, or balance, but he could bend at the waist, drive, finely manipulate (fingering, keyboard), grossly manipulate (grip/grasp, handle), and reach (above and below shoulder) up to two and a half hours per day.  (*Id.*).  Dr. Rissover reported that plaintiff had no psychiatric or cognitive impairment.  (*Id.*).

In July 2018, shortly after completing the APS, Dr. Rissover noted that plaintiff presented with a new mood disorder but that his diabetes symptoms were stable and medication, diet, and exercise compliance were good.  (Doc. 21 at PAGEID 1572).  While plaintiff reported fatigue, arthralgias, and gait problems, he did not report dizziness, numbness, other neurological symptoms, abdominal issues, chest pain, or vision disturbance.  (*Id.* at PAGEID 1575).  Plaintiff did report confusion and decreased concentration, but the record suggests a relation between these and plaintiff's newly reported mood disorder.  (*See id.* at 1572, 1575); (*see also* Doc. 18 at PAGEID 782) (Dr. Dalton suspecting a "strong mood component to [plaintiff's] current symptoms[.]").  Plaintiff's physical examination was normal.  (*Id.* at PAGEID 1576) (no musculoskeletal, abdominal, or chest tenderness).

In September and November 2018, plaintiff reported the same symptoms as in July 2018 while exhibiting no abnormalities on physical examination.  (*Id.* at PAGEID 1583-84; 1592-93).  In November 2018, plaintiff reported issues with the medication Crestor, which he stated made "his whole body hurt."  (Doc. 22 at PAGEID 1814).  Dr. Rissover filled out another APS in November 2018, in which he limited plaintiff to intermittently sitting, standing, and walking only one hour at a time each and to three hours of each activity during an eight-hour workday.  (Doc. 20 at PAGEID 1432).  He opined that plaintiff could never bend at the waist,[8] kneel/crouch, climb, or reach (below shoulder), but he could balance, drive, finely manipulate (fingering,

---

[8] This limitation was new, even though plaintiff demonstrated no abdominal tenderness on examination in September or November 2018.  (*See* Doc. 21 at PAGEID 1584, 1593).

keyboard), grossly manipulate (grip/grasp, handle), and reach (above shoulder) up to two and a half hours per eight hours. (*Id.*). Dr. Rissover listed "anxiety" as a psychiatric/cognitive impairment. (*Id.*).

When Dr. Rissover examined plaintiff on February 26, 2019 for a respiratory illness (Doc. 22 at PAGEID 1873), plaintiff reported fatigue and gait problems but not chest pain, chest tightness, palpitations, dizziness, or myalgias. (*Id.* at 1892). Plaintiff's physical examination reflected no abnormalities. (*Id.* at 1892-93) (including no chest or abdominal tenderness). Dr. Rissover completed another APS on February 26, 2019, which was virtually identical to his November 14, 2018 APS. (Doc. 21 at PAGEID 1391-92).

Less than two months later, on April 8, 2019, Dr. Rissover examined plaintiff in connection with disability forms. (Doc. 21 at PAGEID 1611). Plaintiff created a memo that outlined numerous conditions and symptoms (Doc. 25 at PAGEID 2430-33), but a physical examination did not reflect any abnormalities. (Doc. 21 at PAGEID 1614-15). Notwithstanding the largely static nature of Dr. Rissover's observations, he greatly increased plaintiff's activity restrictions on a contemporaneous APS. (Doc. 25 at PAGEID 2429) (plaintiff restricted from all activities except driving, which he was permitted to do for up to two and a half hours). Dr. Rissover further reduced plaintiff's ability to intermittently sit, stand, or walk to up to only one hour per day. (*Id.*). In addition to the listed impairment of anxiety, Dr. Rissover included "short term memory loss" as a cognitive impairment, with no explanation supporting the statement. (*Id.*). Dr. Rissover's April 8, 2019 treatment notes do not reflect any observation of such symptoms. (*See* Doc. 21 at PAGEID 1614-15). Plaintiff neither complained about anxiety or short-term memory loss, nor did Dr. Rissover observe or diagnose these impairments. (*Id.*).

In June and November 2019, plaintiff's symptom reports escalated significantly from prior records. (Doc. 23 at PAGEID 2231) (fatigue; chest tightness, pain, and palpitations; abdominal distention and pain and incontinence at night; cold intolerance; joint and muscle pain, dizziness, right sided weakness and numbness, and confusion) (no vision issues)); (Doc. 24 at PAGEID 2334) (fatigue, joint pain, gait problems, dizziness, numbness in his feet, confusion, and decreased concentration) (no vision issues)). On physical examination in June 2019, however, plaintiff exhibited normal range of motion in his neck and musculoskeletal system without tenderness; no chest tenderness; no abdominal tenderness; and no abnormal neurological symptoms. (Doc. 23 at PAGEID 2232). Diabetic monofilament testing in five bilateral areas was normal, as was the remainder of the foot examination. (*Id.*). Plaintiff's symptom report and physical examination in November 2019 were similar. (Doc. 24 at PAGEID 2334) (fatigue, arthralgias, gait problems, dizziness, numbness in feet, confusion, and decreased concentration reported but no chest pain or palpitations, abdominal issues, or cold intolerance). Plaintiff's physical examination was normal, and he exhibited no chest tenderness, distension or tenderness of the abdomen, and no edema or tenderness of his musculoskeletal system. (*Id.* at PAGEID 2335).

### 6. Gastroenterologist: Dr. Andrew Sun

Dr. Sun examined plaintiff in November 2019 upon Dr. Rissover's referral. (Doc. 23 at PAGEID 2112). Dr. Sun noted plaintiff's NASH, but stated that plaintiff's "liver enzymes [were] only borderline abnormal." (*Id.* at PAGEID 2115). Plaintiff's physical examination exhibited no abnormalities. (*Id.* at 2114-15). Dr. Sun assessed possible gastritis, rule out diabetic gastroparesis. (*Id.*) ("Abdomen nondistended, soft, and nontender."). Dr. Sun noted that

he strongly recommended an EGD and colonoscopy, which plaintiff declined, and further noted that plaintiff had "many excuses not to do what I suggested him to do."  (*Id.*).

### C.  ERISA law

The Sixth Circuit has directed that claims regarding the denial of ERISA benefits are to be resolved using motions for judgment on the administrative record.  *Wilkins*, 150 F.3d at 619. The district court is to conduct its review "based solely upon the administrative record."  *Id.  See also Zenadocchio v. BAE Sys. Unfunded Welfare Ben. Plan*, 936 F. Supp. 2d 868, 872 (S.D. Ohio 2013).  The Court's review is confined to the administrative record as it existed on the date the administrator issued its final decision upholding the termination of the claimant's disability benefits.  *Moon v. Unum Provident Corp.*, 405 F.3d 373, 378-79 (6th Cir. 2005) (citing *Wilkins*, 150 F.3d at 615).

For a successful claim of disability benefits under ERISA, plaintiff carries the burden to "prove by a preponderance of the evidence that he was 'disabled,' as that term is defined in the Plan."  *Bruton v. Am. United Life Ins. Corp.*, 798 F. App'x 894, 901 (6th Cir. 2020) (quoting *Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. or LBA Emps.*, 741 F.3d 686, 700-01 (6th Cir. 2014)) (remaining citations omitted).  *See also Rose v. Hartford Fin. Servs. Grp., Inc.*, 268 F. App'x 444, 452 (6th Cir. 2008) (The plaintiff "b[ears] the burden of producing evidence that she was disabled under the terms of the policy.").  As relevant here, plaintiff must show that he was "prevented from performing one or more of the Essential Duties of . . . [his] Occupation, for the twenty-four months following the Elimination Period, and . . . after that, Any Occupation."  (Doc. 22 at PAGEID 1968).  "The critical question for purposes of [plaintiff's] eligibility for disability benefits is not whether []he does or does not have [a diagnosed

condition], but whether []he is disabled under the plan." *Huffaker v. Metro. Life Ins. Co.*, 271 F. App'x 493, 502 (6th Cir. 2008)

The parties agree that the Court's review of Hartford's determination is *de novo* in this case.  (Doc 32-1 at PAGEID 2525; Doc. 36 at PAGEID 2633).  Under a *de novo* standard of review, the Court "take[s] a 'fresh look' at the administrative record, . . . giving proper weight to each expert's opinion in accordance with supporting medical tests and underlying objective findings, and 'accord[ing] no deference or presumption of correctness' to the decisions of the . . . plan administrator." *Bruton*, 798 F. App'x at 902 (quoting *Javery*, 741 F.3d at 700).

In ERISA cases, "courts may not conclude that the opinion of treating physicians is entitled to more weight than that of non-treating physicians." *Id.* at 904 (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 830 (2003)).  At the same time, Hartford "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.* (citing *Black & Decker*, 538 U.S. at 834).  Courts are also to be wary of a plan administrator's dismissal of a plaintiff's subjective complaints as exaggerated, where the administrator did not actually meet or examine the plaintiff. *Id.* (citing *Calvert v. Firstar Fin.*, Inc., 409 F.3d 286, 296-97 (6th Cir. 2005)).  "[T]he failure to conduct a physical examination, where the Plan document gave the plan administrator the right to do so, 'raises questions about the thoroughness and accuracy of the benefits determination.'" *Guest-Marcotte v. Life Ins. Co. of N. Am.*, 730 F. App'x 292, 301 (6th Cir. 2018) (quoting *Shaw v. AT & T Umbrella Ben. Plan No. 1*, 795 F.3d 538, 550 (6th Cir. 2015)).  This is particularly so where a benefits denial is based on a credibility determination made by a file examiner whose review is not based on a comprehensive medical record.  *See Holden v. Unum Life Ins. Co. of Am.*, No. 20-6318, 2021 WL 2836624, at *13 (6th Cir. July 8, 2021).  There is "nothing inherently objectionable[,]"

however, "about a file review by a qualified physician in the context of a benefits

determination." *Id.* (quoting *Calvert*, 409 F.3d at 296).

### D. Analysis

The Court has reviewed the administrative record *de novo* and concludes that plaintiff has

not shown by a preponderance of the evidence that he was disabled under the Plan. Plaintiff's

motion (Doc. 36) argues that the record establishes his disability and that Hartford's file

reviewers made credibility determinations without requiring in-person examinations. In his

response to Hartford's motion (Doc. 42), plaintiff reiterates his position that the record reflects

his disability and challenges any requirement for objective evidence of plaintiff's disability under

the Plan.

At base, the Court finds that plaintiff has presented ample evidence that he has been

diagnosed with several medical conditions, but that only begins the relevant inquiry. *Huffaker*,

271 F. App'x at 502. Plaintiff must demonstrate that the symptoms actually produced by his

medical conditions prevented him from performing his financial analyst job. *Javery*, 741 F.3d at

701. The Court begins with a review of plaintiff's job and considers the requirements of that job

against the medical record. The Court then addresses plaintiff's arguments concerning the role

of objective evidence in the disability-benefits determination.

#### 1. Functional requirements of plaintiff's job

The parties agree that plaintiff's job was sedentary and required the use of a keyboard.

(Doc. 32-1 at PAGEID 2526; Doc. 36 at PAGEID 2635). Plaintiff described his job functions as

"finance, overseeing financial functions, computers, typing, reporting, planning, reviewing

capital assets, desk work, some walking standing, no lifting[.]" (Doc. 16 at PAGEID 108). The

internal Robert Bosch job description lists various essential duties and responsibilities that

contemplate desk and computer work as well as an intellectual component (i.e., financial expertise). *See supra* p. 3 (citing Doc. 19 at PAGEID 1123). The Occupational Information Network's definition of a financial analyst cited by plaintiff (Doc. 36 at PAGEID 2635)[9] references gathering and analyzing business, financial, and economic data, explaining or making recommendations to others based on that data, and using a phone and computer. *See* https://occupationalinfo.org/onet/25315.html (last visited November 29, 2021). Distilled, the Court finds that "Your Occupation" for purposes of the Plan required that plaintiff could, physically, sit and use a computer for extended periods of time and, mentally, exercise his financial expertise by analyzing data and communicating his conclusions to others.

Only one medical provider, Dr. Rissover, generated any relevant medical evidence of plaintiff's functional restrictions/limitations supporting an inability to perform these job functions. That evidence (contained in APSs) is inconsistent with Dr. Rissover's treatment notes. The records of at least seven other medical providers that examined plaintiff (some on several occasions) as well as Hartford's file reviewing physician are inconsistent with the severity of the functional limitations that Dr. Rissover recommends. Though plaintiff argues that Hartford requested an APS only from Dr. Rissover, the record reflects that plaintiff sought disability paperwork from other providers without success. (*See* Doc. 18 at PAGEID 776) ("He inquires about disability paperwork and states that his PCP and endocrinologist will not fill it out and he is here today hoping that I will complete the paperwork."). In addition, the Social Security Administration denied plaintiff's disability insurance benefit claim, which is not determinative but may be considered. *Cook v. Prudential Ins. Co. of Am.*, 494 F. App'x 599, 607

---

[9] The ERISA Plan defines "Your Occupation" as "it is recognized in the general workplace" and "does not mean the specific job You are performing for a specific employer or at a specific location." (Doc. 27 at PAGEID 2488).

(6th Cir. 2012) ("[A Social Security Administration award of benefits] is . . . a consideration in the court's review.").

After reviewing *de novo* the administrative record against the applicable, functional requirements for plaintiff's job as a financial analyst, the Court concludes that Hartford's decision should be upheld.

### a.  *Extended sitting and keyboarding*

Plaintiff points to his reports of pain, sensory loss, numbness on the right side of his body, and gait problems as interfering with his ability to use a keyboard and sit for extended periods of time.  In May of 2018, Dr. Rissover opined that plaintiff could sit continuously for one-hour at a time for a total of six hours and keyboard up to two and a half hours in an eight-hour workday (Doc. 19 at PAGEID 1037).  In November of 2018, Dr. Rissover's opinion changed to recommending only intermittent sitting for one-hour at a time for a total of three hours in an eight-hour workday but his keyboarding restriction remained the same.  (Doc. 20 at PAGEID 1432).  In April 2019, his opinion changed again to recommending only intermittent sitting for one-hour at a time for a total of one hour in an eight-hour workday and no keyboarding at all.[10]  (Doc. 25 at PAGEID 2429).  Only on this last APS does Dr. Rissover cite to any findings or diagnoses (joint pain, balance, neuropathy, stroke) to support his recommended restrictions and limitations.  (*Id.*).  Dr. Rissover's other APSs do not cite any findings or diagnoses to support his opinion on plaintiff's limitations.  As detailed below, plaintiff's other treating physicians did not endorse such limitations, and their treatment records, as well as those of Dr. Rissover, do not align with such escalating limitations.

---

[10] As noted above, in this APS, Dr. Rissover restricted plaintiff from all activities except driving, which he permitted plaintiff to do for up to two and a half hours.  The Court finds this inconsistent with his simultaneous total restrictions in gross and fine manipulations, which are required in order to drive a car (e.g., steering, turn signals, etc.).

In May 2016, Dr. Krebs recorded a history of right-sided neuropathy, which could potentially interfere with sitting and keyboarding. (Doc. 20 at PAGEID 1279). On review of plaintiff's symptoms, however, she noted "negative" for "bone/joint symptoms, myalgia and numbness in extremity." (*Id.* at PAGEID 1281). On physical examination, plaintiff exhibited no abnormal neurological or extremity symptoms. (*Id.*). In August 2017, plaintiff saw Dr. Krebs and reported paresthesia and numbness in the back of his lower legs but not his feet (*id.* at PAGEID 1286), but a diabetic foot screen was normal along with the rest of his bodily systems (*id.* at PAGEID 1287). The strongest evidence that these symptoms might have interfered with sitting and keyboarding is from October 2017, when Dr. Krebs treated plaintiff for a foot wound possibly related to diabetic loss of sensation. (*Id.* at PAGEID 1289). But upon seeing Dr. Krebs in November 2017, a month later, plaintiff complained only of fatigue *and not* dizziness, joint or muscle pain, numbness, or paresthesia. (*Id.* at PAGEID 1303-04) (plaintiff also denied having back pain, chest pain, abdominal pain, or vision loss). Plaintiff further declined to allow Dr. Krebs to do the functional testing as noted on the APS. (Doc. 19 at PAGEID 1003).

Moreover, while endocrinologist Dr. Eid recorded plaintiff's reported diabetic neuropathy symptoms in 2016 and 2017, his physical examination notes from those visits do not reflect signs of neuropathy. (*See* Doc. 18 at PAGEID 737, 764-65, 803-04, 811-12). Dr. Eid did not diagnose diabetic neuropathy. (*Id.*). Subsequent to his October 2017 foot injury, plaintiff treated with endocrinologist Dr. Cohen, who noted no abnormal findings on general physical examination (Doc. 20 at PAGEID 1331) or on diabetic foot examination (*id.* at PAGEID 1363). Dr. Cohen also did not diagnose diabetic neuropathy. (*Id.* at PAGEID 1330). Also subsequent to the October 2017 foot injury, in June 2018, neurologist Dr. Dalton did not note any abnormalities in her overall physical examination or targeted neurological examination of

plaintiff. (Doc. 20 at PAGEID 1176). In July 2018, just after his May 2018 APS, even Dr. Rissover noted that plaintiff's diabetes symptoms were "stable" and that he denied symptoms of chest pain, numbness/tingling, or vision change. (Doc. 21 at PAGEID 1572-73).

Plaintiff also mentions incontinence as a symptom of diabetic neuropathy, but in its review of the record, the Court did not see this complaint documented throughout most treatment records.[11]

In addition, following a thorough review of the record, file reviewer Dr. Maraian noted that plaintiff did not have urgent hospitalizations related to diabetes,[12] did not complain of neuropathic pain, and was not prescribed medication for neuropathic pain. (Doc. 25 at PAGEID 2447). While plaintiff did report right-sided numbness after December 29, 2018 in his typed symptom report (*see* Doc. 25 at PAGEID 2430) contrary to Dr. Maraian's note, Dr. Maraian correctly observed that there is no evidence that it "cause[d] any impairment. . . ." (*Id.* at PAGEID 2447).

Plaintiff also argues that he was plagued by muscle and joint pain; weakness; and vision issues due to diabetes, NASH, neuropathy, and medication side-effects that would interfere with sitting and keyboarding. In July 2018, plaintiff complained to Dr. Rissover of arthralgias and a gait problem but exhibited no abnormalities on physical examination. (Doc. 21 at PAGEID 1575-76). In September and November 2018, Dr. Rissover recorded no change to plaintiff's symptoms or physical examination findings from July 2018. (*Id.* at PAGEID 1583-84, 1592-93). The only significant change appears to be a negative reaction to a medication, Crestor. (Doc. 22

---

[11] This reported symptom appears in Hartford's internal notes regarding a phone call with plaintiff as well as plaintiff's hand-written symptom summary. (Doc. 17 at PAGEID 384; Doc. 19 at PAGEID 1028).
[12] Plaintiff states that this observation ignores numerous hospitalizations (*see* Doc. 36 at PAGEID 2650), but Dr. Maraian appears to refer to hospitalizations after his initial diabetes diagnosis in 2016 and not those related to chest pain.

at PAGEID 1814).  Dr. Rissover's November 2018 APS, however, dramatically increased

plaintiff's restrictions and limitations.  (*See* Doc. 20 at PAGEID 1432).  In the November 2018

APS, Dr. Rissover opined that plaintiff could never bend at the waist and could only

intermittently sit, stand, and walk up to one hour at a time for a total of three hours in an eight-

hour workday.  (*Id.*); (*see* Doc. 21 at PAGEID 1584, 1593) (no abdominal tenderness recorded

on examination in September or November 2018).  In February 2019, Dr. Rissover's office

records reflect that plaintiff complained of fatigue and a gait problem but not of myalgias or any

other musculoskeletal or neurological symptoms, and plaintiff exhibited no abnormalities on

examination.   (Doc. 22 at PAGEID 1892-93).  Dr. Rissover's February 2019 APS did not vary

significantly from his November 2018 APS.  (Doc. 21 at PAGEID 1391-92).

In April 2019, Dr. Rissover's office records reflect that plaintiff complained of only

fatigue and a gait problem but not of muscle pain, or any other neurological or musculoskeletal

symptoms, and Dr. Rissover's physical examination revealed no abnormalities.  (Doc. 21 at

PAGEID 1614-15).[13]  Yet in April 2019, Dr. Rissover completed another APS that greatly

increased plaintiff's restrictions and limitations.  (*See* Doc. 25 at PAGEID 2429) (plaintiff

restricted from all activities (except driving) and from reaching below the shoulder).

Plaintiff's physical examinations by other treating physicians in the record do not reflect

abnormalities typically associated with joint and muscle pain and weakness, such as loss of

musculoskeletal range of motion or tenderness.  *Cf. Curry v. Eaton Corp.*, 400 F. App'x 51, 62

(6th Cir. 2010) (objective findings supporting a fibromyalgia diagnosis under ERISA plan

include decreased range of motion and tenderness); *Huffaker*, 271 F. App'x at 501 ("MetLife did

not arbitrarily refuse to credit Dr. Bozeman's findings given the inconsistency between . . .

---

[13] Plaintiff's typed symptom report prepared for Dr. Rissover in April 2019 included many more symptoms.  (Doc.
25 at PAGEID 2430-33).

subjective complaints of pain and . . . findings of normal muscle strength and range of motion.").
Plaintiff also did not consistently report these symptoms.

In August 2016, plaintiff reported arthralgias, myalgias, back pain and neck stiffness, but
Dr. Eid recorded normal range of motion, no edema, and no tenderness. (Doc. 18 at PAGEID
736-37). In September 2016, plaintiff denied experiencing any of these symptoms with Dr.
Vonderbrink, who recorded no musculoskeletal edema or tenderness and normal strength,
reflexes, and muscle tone. (*Id.* at PAGEID 745-46). Throughout 2017, plaintiff denied
experiencing bone/joint pain, myalgia (Doc. 20 at PAGEID 1281, 1304), back pain (*id.* at
PAGEID 1286), and musculoskeletal symptoms (*id.* at PAGEID 1297) to Dr. Krebs. Other than
noting an antalgic gait in November (*id.* at PAGEID 1304), Dr. Krebs's extremity and
musculoskeletal examinations were normal during this time. (*Id.* at PAGEID 1281, 1287, 1297,
1304). In January 2018, Dr. Cohen recorded normal musculoskeletal range of motion without
edema or tenderness and normal muscle tone. (Doc. 20 at PAGEID 1330). In May 2018, Dr.
Cohen recorded normal range of motion and muscle tone. (*Id.* at PAGEID 1363). In November
2019, plaintiff denied arthralgias and back pain to gastroenterologist Dr. Sun, who recorded no
musculoskeletal abnormality on physical examination. (Doc. 23 at PAGEID 2114-15). In
February 2019, plaintiff did not report muscle pain to Dr. Rissover during either of two
examinations. (Doc. 22 at PAGEID 1892; Doc. 21 at PAGEID 1614-15). Only later in 2019 did
plaintiff report these issues to Dr. Rissover. (Doc. 23 at PAGEID 2231 (joint, muscle, and back
pain); Doc. 24 at PAGEID 2334 (joint pain); Doc. 25 at PAGEID 2431 (joint and muscle pain)).

Plaintiff did not report vision issues to Dr. Krebs in October or November 2017 (Doc. 20
at PAGEID 1295-96, 1304) or to Dr. Rissover throughout 2018 (Doc. 21 at PAGEID 1575, 1583,
1592). A diabetic retinal examination conducted on April 29, 2019 showed no diabetic

retinopathy. (Doc. 23 at PAGEID 2208); (*see also* Doc. 18 at PAGEID 787) (diabetic eye examination conducted October 17, 2016 demonstrated that diabetes was "without ophthalmic manifestations"). Plaintiff reported vision issues to his doctors in August 2016 (Doc. 18 at PAGEID 713, 736) and recorded it in a hand-written symptom memo from January 2018 (Doc. 19 at PAGEID 1028), but this was not a regularly reported issue in the treatment record.

In addition, the record contains evidence that plaintiff was not compliant with treatment regimens. (*See, e.g.,* Doc. 20 at PAGEID 1361) (May 2018 record from Dr. Cohen) (plaintiff was "instructed to keep diet records"); Doc. 21 at PAGEID 1572 (Dr. Rissover noting in July 2018 that plaintiff was not keeping a sugar book and did not provide accurate medication lists); Doc. 21 at PAGEID 1580 (Dr. Rissover September 2018 visit) ("Please record [glucose] and bring [record to] your next visit. Keep up your glucose BOOK!"); Doc. 22 at PAGEID 1901 (Dr. Rissover February 2019 visit) ("Please record [glucose] and bring [record to] your next visit."); Doc. 20 at PAGEID 1331 (plaintiff acknowledging to Dr. Cohen that he was having "difficulty accepting living with diabetes[,]" and Dr. Cohen noting that only "modest adjustments were needed for "good glycemic control. . . ."); Doc. 20 at PAGEID 1177 (plaintiff "readily admit[ted]" to Dr. Dalton that his "diabetes/bp are not well controlled."); Doc. 22 at PAGEID 2008 (Dr. Martin noting "some medical noncompliance[,]" including that plaintiff had "stopped taking his fenofibrate despite markedly elevated triglycerides."); Doc. 23 at PAGEID 2113 (Dr. Sun noting that plaintiff refused his primary care physician's recommendation to have a colonoscopy to examine gastrointestinal issues); Doc. 20 at PAGEID 1156 (Dr. Gripshover suggesting a repeat neuropsychological evaluation and sleep study, neither of which is in the record as having been completed). The Plan states that a participant's refusal to "receive recommended treatment that is generally acknowledged by Physicians to cure, correct or limit

the disabling condition" can result in termination of payments.  (Doc. 22 at PAGEID 1960).  *See also Phillips v. Life Ins. Co. of N. Am.*, No. 1:10-cv-00064, 2011 WL 4435670, at \*7 (W.D. Ky. Sept. 22, 2011) ("Noncompliance with a treatment regime may be used by the administrator in deciding whether disability benefits are proper.").  Also, while not conclusive, the record reflects that plaintiff performed work that appears inconsistent with the severity of restrictions and limitations suggested by Dr. Rissover.  (*See* Doc. 17 at PAGEID 457 (substitute teaching); Doc. 20 at PAGEID 1151 (landscaping, rental property maintenance, resale of exercise equipment)).

In sum, the records of two endocrinologists and a neurologist do not reflect any signs of plaintiff's alleged diabetic neuropathy symptoms on examination and these physicians did not give related diagnoses.  Plaintiff's musculoskeletal and vision issues are largely unobserved on examination by any of his physicians, and his reports of such symptoms in the record escalate only two months *after* Dr. Rissover gave his most restrictive opinion.  (*See* Doc. 23 at PAGEID 2231); (Doc. 24 at PAGEID 2334).  Based on a *de novo* review of the administrative record, the Court concludes that Dr. Rissover's escalating conclusions regarding the extreme nature of plaintiff's limitations and restrictions are neither consistent with his own records nor those of other treating physicians.  *See Ezerski v. Kirlins, Inc.*, No. 3:17-cv-69, 2018 WL 3352945, at \*11 (S.D. Ohio July 9, 2018) (upholding disability denial on *de novo* review, in part, because a physician's functional conclusions were "largely inconsistent" with the weight of contemporaneous medical evidence).  Aside from Dr. Rissover's APSs, nothing in the record explains why plaintiff could not have performed the physical components of his job as a financial analyst.

30

b.  *Analyzing and communicating financial information*

Plaintiff points to his reports of chronic fatigue, dizziness, brain fog, word-finding issues, and short-term memory problems throughout the record as the consequences of his uncontrolled diabetes, coronary artery disease, and NASH.  These issues, he argues, prevent him from performing the Essential Duties of his Occupation, including financial analysis and calculations during an eight-hour day.  Dr. Rissover noted fatigue as a secondary condition on each of his APSs.  In April 2019, Dr. Rissover added short-term memory loss as a cognitive condition without explaining the extent of its resulting impairment or etiology.  (Doc. 25 at PAGEID 2429).  None of the APSs specifically tie either of these conditions to the restrictions and limitations prescribed.  As detailed below, a *de novo* review of the administrative record does not support a finding that plaintiff's non-exertional or cognitive impairments limit his ability to perform the analytical and communicative functions of a financial analyst.

While plaintiff's reports of fatigue are well-documented, the evidence in the record does not show that the fatigue he suffers is debilitating, such that it would interfere with his job performance.  As noted *supra*, plaintiff's physicians anticipated that plaintiff could be active and, indeed, recommended he increase his activity.  (*See, e.g.,* Doc. 22 at PAGEID 2012) (May 2019 visit with Dr. Martin) ("Encouraged [plaintiff] to increase his activity levels. . . ."); Doc. 20 at PAGEID 1283 (August 2017 visit with Dr. Krebs) ("Increase activity."); Doc. 24 at PAGEID 2330 (November 2019 visit with Dr. Rissover) ("Exercise for 30-60 minutes 5 times a week").

The only record of manifested, cognitive symptoms upon physical examination appears in an October 2017 record from Dr. Krebs.  (Doc. 20 at PAGEID 1297) ("mildly impaired short term memory").[14]  Dr. Krebs did not observe this issue the following month.  (*See id.* at

---

[14] Plaintiff also highlights a note from a July 2018 visit with Dr. Rissover: "Again very complicated- c/o being in a daze. . . ."  (Doc. 21 at PAGEID 1578).  The Court does not read this note to refer to true cognitive symptoms.

PAGEID 1304). In addition, the medical records related directly to plaintiff's alleged neurological issues from Drs. Dalton and Gripshover do not document any manifestation of or neurological basis for these symptoms. *See supra* pp. 12-13. Dr. Dalton suspected that plaintiff's symptoms were likely related to a mood disorder as opposed to his other diagnosed conditions,[15] and plaintiff declined the opportunity to seek repeat or additional testing. *Id.* Dr. Gripshover's testing was inconclusive, in his opinion, due to lack of effort. *Id.*[16] Plaintiff's endocrinologists and cardiologists did not note any cognitive abnormalities on physical examination, and plaintiff complained primarily of fatigue and not of other cognitive issues. *See supra* pp. 11-12, 13-14. In January 2018, plaintiff even remarked to Dr. Cohen that he was "[v]ery comfortable with numbers and equations. . . ." (Doc. 20 at PAGEID 1331). Plaintiff has not demonstrated by a preponderance of the evidence that he experienced fatigue or cognitive issues to the extent that he could not analyze and communicate financial information.

### 2. Objective evidence

Plaintiff argues that to read the Plan to require objective evidence of his disability is an unwarranted addition to the Plan's terms and is otherwise not appropriate in this case. Even if objective evidence is required, plaintiff argues that Hartford initially allowed the long-term disability claim based on plaintiff's subjectively reported symptoms of diabetic neuropathy. Plaintiff argues that Hartford was not entitled to thereafter change course based on Dr. Maraian's peer review on administrative appeal.

---

Moreover, the note goes on to raise obstructive sleep apnea and depression, for which the record does not reflect treatment, as possible symptom drivers. (*Id.*).

[15] Dr. Rissover may have reached the same conclusion regarding confusion/concentration symptoms. (*See* Doc. 21 at 1572, 1575).

[16] Plaintiff reported that he fell asleep during parts of this testing, but Dr. Gripshover did not actually observe plaintiff asleep. (*See* Doc. 25 at PAGEID 2432; Doc. 20 at PAGEID 1155).

First, the Court does not agree that Hartford's insistence on objective evidence to support plaintiff's alleged disability unduly adds to the Plan's terms. *See Temponeras v. U.S. Life Ins. Co. of Am.*, 185 F. Supp. 3d 1010, 1020 (S.D. Ohio 2016) (citing *Disanto v. Wells Fargo & Co.*, 2007 WL 2460732 (M.D. Fla. Aug. 24, 2007) (noting that the lack of an objective medical evidence requirement would make the review of long-term disability claims meaningless, and that such a requirement is appropriate even if it does not appear explicitly in an ERISA plan)). Plaintiff attempts to distinguish this case on the basis that the plaintiff therein claimed to be disabled over a four-year period with *no* corresponding treatment and had *no* evidence that her disabling condition began prior to coverage lapsing under the plan at issue. *Id.* at 1013, 1015. The fact, however, that the lack of objective evidence was more egregious in *Temponeras* than in this case does not make the reasoning in *Temponeras* inapplicable.

Next, the Court finds that an objective evidence requirement is warranted in this case. Plaintiff relies on *Guest-Marcotte*, 730 F. App'x at 302, for the proposition that:

> when there is no dispute the claimant suffers from a disease that is objectively established, and the disease produces pain or other subjective symptoms, it is arbitrary and capricious to deny the disability claim on the basis there was no objective evidence of the functional limitations without at least requiring the claimant to conduct a physical examination.

(Doc. 42 at PAGEID 2734). The Court, however, does not find the holding of *Guest-Marcotte* to sweep so broadly. In *Guest-Marcotte*, three medical professionals had endorsed restrictions on plaintiff's activities due to her hereditary condition. 730 F. App'x at 295-96. Moreover, the court noted that the plaintiff had submitted "*abundant* evidence that she *in fact experienced* such pain." *Id.* at 301 (emphasis added). *See also id.* at 302 ("[M]ultiple doctors informed [the defendant] that the pain would make it impossible for Guest-Marcotte to drive, sit still, or concentrate for extended periods. *Under these circumstances*, it was not reasonable [to deny the

33

plaintiff's claim without a physical examination.]") (emphasis added).  The record in this case is readily distinguishable.

Plaintiff also attempts to distinguish *Rose v. Hartford Fin. Servs. Grp., Inc.*, 268 F. App'x 444, 453 (6th Cir. 2008), in which the court held that "it is entirely reasonable for an insurer to request objective evidence of a claimant's functional capacity."  The court in *Rose* reiterated that "[r]equiring a claimant to provide objective medical evidence of disability is not irrational or unreasonable.'"  *Id.* (quoting *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 166 (6th Cir. 2007)).  Plaintiff argues that the *Guest-Marcotte* court found *Rose*'s reasoning inapplicable to cases in which the disease(s) at issue is difficult to diagnose objectively (e.g., fibromyalgia and lower back pain).

Here too, however, the Court finds that plaintiff's reading of *Guest-Marcotte* is overbroad.  The plaintiff in *Guest-Marcotte* suffered from "a hereditary disease which is medically known to cause frequent joint dislocations and subluxations along with chronic pain. The record show[ed] that Guest-Marcotte has in fact suffered such frequent dislocations and subluxations, which can be reasonably expected to result in significant pain."  *Guest-Marcotte*, 730 F. App'x at 303.  Something like the frequently documented joint dislocations and subluxations in *Guest-Marcotte*, which would naturally result in pain, is not present in this case. In the Court's view, the reasoning and result in *Guest-Marcotte* turned on the unique medical circumstances at issue.  *Cf. White v. Standard Ins. Co.*, 895 F. Supp. 2d 817, 850 (E.D. Mich. 2012), *aff'd*, 529 F. App'x 547 (6th Cir. 2013) (quoting *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 322 (7th Cir. 2007)) ("Although subjective pain cannot be measured, 'how much an individual's degree of pain or fatigue limits his functional capabilities . . . can be objectively measured.'").

34

Finally, plaintiff contends that even under a deferential standard of review not applicable here, Hartford's reversal of its decision to initially approve his long-term disability claim on the basis of plaintiff's subjective complaints by now insisting on objective evidence would be arbitrary and capricious.  (Doc. 42 at PAGEID 2733, citing *Morris v. Am. Elec. Power Long-Term Disability Plan*, 399 F. App'x 978 (6th Cir. 2010)).  *Morris* is distinguishable.  The *Morris* court took issue with an administrator's change in course on a claim without providing any reason for the change.  *Id.* at 984.  The *Morris* court also, however, expressly contemplated that such a reason could include "evidence better defining [a] participant's medical condition. . . ." *Id.*  The Court finds that this is the type of evidence that Hartford was attempting to secure in this case.  In the notes approving the claim here, Nurse Shaver indicated that the initial decision was based on plaintiff's subjective complaints and that Hartford should secure a medical update. (Doc. 17 at PAGEID 433).  Hartford provided plaintiff with Dr. Maraian's report, which undercut the diabetic neuropathy diagnosis (Doc. 25 at PAGEID 2447) and allowed plaintiff twenty-one days to respond (Doc. 17 at PAGEID 494).  Plaintiff did not respond.  (*Id.* at PAGEID 492).

Plaintiff also cautions the Court against dismissing his subjective reports of symptoms, relying on several Sixth Circuit decisions.  *See, e.g, Calvert*, 409 F.3d at 296-97; *Zuke v. Am. Airlines, Inc.*, 644 F. App'x 649, 654 (6th Cir. 2016).  These decisions, however, target a situation in which a file-reviewing physician ignores subjective symptoms that are otherwise largely consistent with the medical record.  *See Calvert*, 409 F.3d at 297 (claim denial was arbitrary and capricious where the file reviewing physician asserted "that there was *no objective data* . . . to support *any* restriction on her activities" but missed or ignored significant amounts of such data); *Zuke*, 644 F. App'x at 654 (finding a determination arbitrary and capricious where

"the plan administrator stated that there were no measurements of range-of-motion restrictions; no specific physical examinations to indicate functional impairment; and no neurological and motor strength testing" when all of that information was, in fact, in the record).

That is not the case here, where *treating physicians'* notes were often at odds with plaintiff's subjective symptom reports. (*See, e.g.,* Doc. 18 at PAGEID 782) (Dr. Dalton) ("I do not appreciate any discrete neurologic deficits. . . . I do not have a neurologic diagnosis."); (Doc. 20 at PAGEID 1154) (Dr. Gripshover) ("Because of [plaintiff's] subpar effort, it was not possible to objectively corroborate his cognitive complaints."). Moreover, the reports of both file reviewers in this case demonstrate that each physician reviewed the whole record. (*See* Doc. 22 at PAGEID 2029-2039; Doc. 25 at PAGEID 2438-48).

Plaintiff also relies on *Guest-Marcotte* for the proposition that "[w]here the plaintiff offered proof she suffers from [an] objectively identifiable condition, which causes subjective symptoms such as pain, [the] insurer may not make [a] credibility determination about [the] plaintiff's complaints of pain without requiring an in-person exam." (Doc. 36 at PAGEID 2648). As explained *supra*, however, the *Guest-Marcotte* court did not adopt a *per se* rule that an in-person examination is always required in the event of a credibility determination; rather, it concluded that "*[o]n the facts of [the case before it]*, [the defendant] should not have discounted Guest-Marcotte's claims of disabling chronic pain without exercising that right." *Guest-Marcotte*, 730 F. App'x at 302 (emphasis added). In this case, Hartford was not required to conduct an in-person examination because Dr. Maraian's review of the medical evidence did not implicate plaintiff's credibility. (*See* Doc. 41 at PAGEID 2722). Like in *Holden*, the file reviewers here "evaluated a comprehensive medical record" and their conclusions primarily "echo those of [plaintiff's] own doctors, make note where the reports lack objective medical

36

evidence in support of the boxes checked, and point out the internal inconsistencies" in the file reviewed. 2021 WL 2836624, at *13 (quoting *Judge v. Met. Life Ins. Co.*, 710 F.3d 651, 663 (6th Cir. 2013)).

The Court is not persuaded that Hartford's consideration of whether objective evidence supported Dr. Rissover's opined limitations impermissibly added to the Plan's terms.[17] The Court likewise is not persuaded that Hartford unduly downplayed plaintiff's symptom reports.

### E. Attorney fees

Hartford makes a perfunctory request for attorney fees under 29 U.S.C. § 1132(g) in its motion. (Doc. 32 at PAGEID 2519). "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) (quoting *Citizens Awareness Network, Inc. v. U.S. Nuclear Regul. Comm'n*, 59 F.3d 284, 293-94 (1st Cir. 1995)). This is no less applicable in the context of attorney fees. *See Laake v. Benefits Comm.*, No. 1:17-cv-611, 2019 WL 823575, at *7 (S.D. Ohio Feb. 21, 2019). Hartford's request for attorney fees should be denied.

### III. Conclusion

Plaintiff appears to rest on the fact that the record contains ample evidence that he suffers from several legitimate medical conditions. The preponderance of the evidence in the medical record, however, does not show how these conditions rendered plaintiff disabled under the Plan. Plaintiff highlights numerous references in the record to plaintiff's abnormal A1C, glucose, and triglyceride numbers and high blood pressure readings. (*See, e.g.,* Doc. 36 at PAGEID 2640). These numbers alone, however, do not compel any particular conclusions regarding plaintiff's

---

[17] To the extent plaintiff contends he was denied a full and fair review of this information (Doc. 42 at PAGEID 2733, 2739 n.2), the Court also finds that plaintiff had a fair opportunity to respond to the new opinion secured by Hartford on plaintiff's diabetic neuropathy.

functional abilities.[18]  Only one medical professional, Dr. Rissover, opined that plaintiff was so severely functionally limited as to suggest disability under the Plan.  Dr. Rissover's own records, however, are inconsistent with such an opinion.  Moreover, the weight of the medical evidence in the record does not consistently reflect that plaintiff suffered from the symptoms alleged or that his functional abilities were significantly impacted by such symptoms.  Hartford's decision to deny long-term benefits should therefore be upheld.

**IT IS THEREFORE ORDERED** that plaintiff's motion to strike (Doc. 38) is granted.

**IT IS THEREFORE RECOMMENDED** that Hartford's motion for judgment on the administrative record (Doc. 32-1) be **GRANTED**, that Hartford's request for attorney fees be **DENIED**, and that  plaintiff's motion for judgment on the administrative record (Doc. 36) be **DENIED**.

Karen L. Litkovitz
United States Magistrate Judge

---

[18] For example, highlighted A1C readings are not far from Dr. Rissover's 8.0% target for plaintiff.  (*See* Doc. 21 at PAGEID 1572).  Dr. Cohen noted that plaintiff had been capable of controlling his triglycerides with drugs and diet. (*See* Doc. 20 at PAGEID 1331).  Plaintiff's references to high glucose levels and blood pressure, untethered to any related comment from his medical providers about their impact on his function, do little to impact the disability determination.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

PATRICK KLANCAR,                          Case No. 1:20-cv-730
    Plaintiff,                            McFarland, J.
                                          Litkovitz, M.J.

    vs.

THE HARTFORD LIFE AND
ACCIDENT INSURANCE COMPANY
    Defendant.

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation within FOURTEEN (14) DAYS after being served with a copy thereof.  This period may be extended further by the Court on timely motion by either side for an extension of time.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections WITHIN 14 DAYS after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).